UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| EMILY LEMOND, Individually and Derivatively on Behalf of NEW YORK COMMUNITY BANCORP, INC., a Delaware Corporation, | Case No.: |
| Plaintiff, | VERIFIED SHAREHOLDER DERIVATIVE ACTION |
| v. | |
| MICHAEL F. MANZULLI, DOMINICK CIAMPA, THOMAS A. DOHERTY, JOSEPH R. FICALORA, MAX L. KUPFERBERG, JOSEPH L. MANCINO, JOHN M. TSIMBINOS, DONALD M. BLAKE, MAUREEN E. CLANCY, ROBERT S. FARRELL, WILLIAM C. FREDERICK, MICHAEL J. LEVINE, GUY V. MOLINARI, JOHN A. PILESKI, JAMES J. O'DONOVAN, and SPIROS J. VOUTSINAS, | JURY TRIAL DEMANDED |
| Defendants, | |
| and | |
| NEW YORK COMMUNITY BANCORP, INC., a Delaware Corporation | |
| Nominal Defendant. | |

Plaintiff Emily Lemond, by her undersigned attorneys, on personal knowledge as to herself and her own acts and on information and belief as to all other matters, based upon an investigation by plaintiff's counsel, alleges as follows:

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought by a shareholder of New York Community Bancorp, Inc. ("NYB" or the "Company"), on behalf of the Company against certain

of its officers and directors seeking to remedy defendants' breaches of fiduciary duties, gross mismanagement, and waste of corporate assets that occurred between June 27, 2003 and May 9, 2004, inclusive (the "Relevant Period") and that have caused substantial losses to NYB and other damages, such as its reputation and goodwill.

## JURISDICTION AND VENUE

2.      Jurisdiction is based upon the diversity of citizenship of the parties under 28 U.S.C. §1332. Plaintiff is a citizen of the state of Connecticut. Defendants, as alleged below, are citizens of the state of New York. The amount in controversy exceeds $75,000.

3.      This shareholder derivative action is brought pursuant to Fed.R.Civ.P.

4.      The nominal defendant, New York Community Bancorp, Inc. is a Delaware corporation and maintains its principal place of business at 615 Merrick Avenue, Westbury, New York 11590.

5.      This action is not brought collusively to confer jurisdiction on this Court which it would not otherwise have.  NYB has employees and agents and conducts substantial business in New York.  Venue is proper because NYB conducts substantial business in this District and a substantial part of the events or omissions described herein giving rise to the claims arose and occurred in this District.

## PARTIES

6.      Plaintiff Emily Lemond is currently, and has been at all relevant times, the owner of shares of the common stock of NYB.

-2-

**Nominal Defendant**

7.     NYB is a citizen of the state of Delaware and New York, and serves as the holding company for New York Community Bank (the "Bank"). The Bank's principal business consists of accepting retail deposits from the general public in the areas surrounding its branch offices and investing those deposits, together with funds generated from operations and borrowings, into multi-family, commercial real estate, and construction loans. The Bank also invests its cash flows into mortgage-backed and related securities and, to a lesser extent, into various debt and equity securities. To reduce its exposure to credit and interest rate risk, it originates one-to four-family and other loans on a pass-through basis, selling such loans to a third-party conduit upon the loans being closed. The Bank serves its customers through a network of 142 banking offices in New York City, Long Island, Westchester County and New Jersey.

**Individual Defendants**

8.     Defendant Michael F. Manzulli ("Manzulli") is a citizen of the state of New York and has been Chairman of New York Community Bancorp, Inc. and New York Community Bank since October 31, 2003. Defendant Manzulli joined the Company and the Bank as Chairman on July 31, 2001, in connection with the Company's merger with Richmond County Financial Corp. Prior to the merger, Defendant Manzulli had served as Chairman and Chief Executive Officer of Richmond County Financial Corp. and of Richmond County Savings Bank. Defendant Manzulli is also Chairman of the Staten Island Economic Development Corporation, Chairman of Staten Island Partnership, Inc., a member of the Board of Directors of the Staten Island Historical Society, a member of the Staten Island Advisory Board of the Salvation Army, a member of the Board of Directors of St. Elizabeth Ann's Nursing Home, and a member of the Staten Island Rotary Club.

-3-

In addition, he serves as President, Chief Executive Officer, and Director of Richmond County Savings Foundation. Defendant Manzulli is also a member of the Board of Directors of the Community Bankers Association of New York State, a member of America's Community Bankers, and a member of the Richmond County and New York State Bar Associations. He knew or was reckless in not knowing of the adverse information about NYB's business and practices. He is not disinterested, is not independent, and cannot fairly and appropriately respond to any shareholder demand.

9.      Defendant Dominick Ciampa ("Ciampa") is a citizen of the state of New York and has been a Director of New York Community Bancorp, Inc., and New York Community Bank since 1995. A member of the Mortgage and Real Estate and Nominating Committees of the Board, Ciampa is a Principal in the Ciampa Organization, a Queens-based real estate development firm. He knew or was reckless in not knowing of the adverse information about NYB's business and practices. He is not disinterested, is not independent, and cannot fairly and appropriately respond to any shareholder demand.

10.     Defendant Thomas A. Doherty ("Doherty") is a citizen of the state of New York and joined the Board of Directors of New York Community Bancorp, Inc. and New York Community Bank in connection with the Company's merger with Roslyn Bancorp, Inc. From 1999 until October 31, 2003, Defendant Doherty served as a Director of Roslyn Bancorp, Inc. and The Roslyn Savings Bank. Defendant Doherty formerly served as the Chairman, President, and Chief Executive Officer of Fleet Bank. Defendant Doherty also was the Chief Administrative Officer of First Quality Enterprises, Inc. and its affiliates, a privately-owned manufacturer of non-woven materials and hygiene-related products, where he is now a consultant. He knew or was reckless in not knowing

-4-

of the adverse information about NYB's business and practices. He is not disinterested, is not independent, and cannot fairly and appropriately respond to any shareholder demand.

11.     Defendant Joseph R. Ficalora ("Ficalora") is a citizen of the state of New York and has been President and Chief Executive Officer and a Director of New York Community Bancorp, Inc. since its inception on July 20, 1993 and Chief Executive Officer of its primary subsidiary, New York Community Bank, since January 1, 1994. On January 1, 2004, Defendant Ficalora became President of the Bank, a position he held previously, from January 1, 1994 through July 31, 2001. In addition, Defendant Ficalora served as Chairman of New York Community Bancorp, Inc. (from July 20, 1993) and as Chairman of New York Community Bank from May 20, 1997 through July 31, 2001. Since 1965, when he joined the Bank, Defendant Ficalora has held increasingly responsible positions, crossing all lines of its operations. Prior to his appointment to President and Chief Executive Officer in 1994, Defendant Ficalora had served as President and Chief Operating Officer of the Bank (beginning in October 1989) and previously as Executive Vice President, Comptroller, and Secretary (beginning in August 1988). He knew or was reckless in not knowing of the adverse information about NYB's business and practices. He is not disinterested, is not independent, and cannot fairly and appropriately respond to any shareholder demand.

12.     Defendant Max L. Kupferberg ("Kupferberg") is a citizen of the state of New York and has been a Director of New York Community Bancorp, Inc. since its inception in 1993 and of New York Community Bank since 1983. A member of the Mortgage and Real Estate, Nominating, and Compensation Committees, and Chairman of the Audit Committee of the Board, Defendant Kupferberg is also Chairman of the Board of Kepco, Inc., a manufacturer of electrical equipment. He knew or was reckless in not knowing of the adverse information about NYB's business and

-5-

practices. He is not disinterested, is not independent, and cannot fairly and appropriately respond to any shareholder demand.

13.     Defendant Joseph L. Mancino ("Mancino") is a citizen of the state of New York and has been a Director of New York Community Bancorp, Inc. and New York Community Bank since October 31, 2003, and served as Co-Chairman of the Company and the Bank from that date until November 15, 2004. Prior to joining the Company, Defendant Mancino served as a Director, President, and Chief Executive Officer of Roslyn Bancorp, Inc. During his tenure with Roslyn, he served as Vice Chairman of the Board of the company (from 1999), as Chairman of the Board and Chief Executive Officer of the bank (from 1993); and as President of the bank from 1993 until February 2000. He became a Director in 1991, including years of service as a Trustee of the bank. He knew or was reckless in not knowing of the adverse information about NYB's business and practices. He is not disinterested, is not independent, and cannot fairly and appropriately respond to any shareholder demand.

14.     Defendant John M. Tsimbinos ("Tsimbinos") is a citizen of the state of New York and has been a Director of New York Community Bancorp, Inc. and New York Community Bank since October 31, 2003, having joined NYB in connection with its merger with Roslyn Bancorp, Inc. From 1999 until the merger with New York Community Bancorp, Defendant Tsimbinos served as Chairman of the Board of Roslyn Bancorp. He served as Vice Chairman of the Board of The Roslyn Savings Bank from 1999 until his retirement in July 2002.  Prior to Roslyn's acquisition of TR Financial Corp. in February 1999, Defendant Tsimbinos was the Chairman of the Board and Chief Executive Officer of Roosevelt Savings Bank, a position he assumed in 1983. He also served as the Chairman of the Board and Chief Executive Officer of TR Financial Corp. since its inception in

-6-

1993. He knew or was reckless in not knowing of the adverse information about NYB's business and practices. He is not disinterested, is not independent, and cannot fairly and appropriately respond to any shareholder demand.

15.     Defendant Donald M. Blake ("Blake") is a citizen of the state of New York and has been a member of the Board of Directors of New York Community Bancorp, Inc. since its inception in 1993 and of New York Community Bank since 1968. A member of the Mortgage and Real Estate Committee, and Chairman of the Nominating and Compensation Committees, Defendant Blake is President and Chief Executive Officer of Joseph J. Blake & Associates, Inc., a national real estate appraisal company. He knew or was reckless in not knowing of the adverse information about NYB's business and practices. He is not disinterested, is not independent, and cannot fairly and appropriately respond to any shareholder demand.

16.     Defendant Maureen E. Clancy ("Clancy") is a citizen of the state of New York or New Jersey and has been a Director of New York Community Bancorp, Inc. and New York Community Bank since October 31, 2003, having joined the Board following the Company's merger with Roslyn Bancorp and The Roslyn Savings Bank. From 1993 through February 1999, when she joined the Roslyn Board of Directors, Defendant Clancy was a Director of TR Financial Corp. and Roosevelt Savings Bank. Defendant Clancy is also Secretary-Treasurer of Clancy & Clancy Brokerage Ltd., an insurance agency. She knew or was reckless in not knowing of the adverse information about NYB's business and practices. She is not disinterested, is not independent, and cannot fairly and appropriately respond to any shareholder demand.

17.     Defendant Robert S. Farrell ("Farrell") is a citizen of the state of New York and joined the Board of Directors of New York Community Bancorp, Inc. and New York Community

-7-

Bank in connection with the Company's merger with Richmond County Financial Corp. on July 31, 2001 and serves on the Audit, Nominating, and Compensation Committees. Defendant Farrell became a Director of Richmond County Financial Corp. in February 1998 and of Richmond County Savings Bank in February 1980. He is President of H.S. Farrell, Inc., a Staten Island-based building supply company. He knew or was reckless in not knowing of the adverse information about NYB's business and practices. He is not disinterested, is not independent, and cannot fairly and appropriately respond to any shareholder demand.

18.     Defendant William C. Frederick ("Frederick") is a citizen of the state of New York and joined the Board of Directors of New York Community Bancorp, Inc. and New York Community Bank in connection with the Company's merger with Richmond County Financial Corp. on July 31, 2001, and is a member of the Nominating Committee. Defendant Frederick became a Director of Richmond County Financial Corp. in February 1998 and of Richmond County Savings Bank in February 1980. He knew or was reckless in not knowing of the adverse information about NYB's business and practices. He is not disinterested, is not independent, and cannot fairly and appropriately respond to any shareholder demand.

19.     Defendant Michael J. Levine ("Levine") is a citizen of the state of New York and has been a Director of New York Community Bancorp, Inc. and its primary subsidiary, New York Community Bank, since January 1, 2004, and has served as member of the Queens County Savings Bank Divisional Board since November 30, 2000. In addition, Defendant Levine served as a Director of the Company and the Bank from November 30, 2000 through July 31, 2001. A member of the Mortgage and Real Estate Committee of the Board, Defendant Levine is President of Norse Realty Group, Inc. and Affiliates as well as a certified public accountant with the firm Levine &

-8-

Schmutter. He knew or was reckless in not knowing of the adverse information about NYB's business and practices. He is not disinterested, is not independent, and cannot fairly and appropriately respond to any shareholder demand.

20.     Defendant Guy V. Molinari ("Molinari") is a citizen of the state of New York and has been a Director of New York Community Bancorp, Inc. and its primary subsidiary, New York Community Bank, since January 1, 2004, and has served as a member of the Richmond County Savings Bank Divisional Board since January 1, 2002. A well known leader on Staten Island, Defendant Molinari served as Richmond County Borough President from 1989 through 2001; as United States Congressman from 1981 to 1989; and as New York State Assemblyman from 1975 through 1980. In addition, he served as Chairman of the Federal Home Loan Bank of New York from 1990 to 1994. He knew or was reckless in not knowing of the adverse information about NYB's business and practices. He is not disinterested, is not independent, and cannot fairly and appropriately respond to any shareholder demand.

21.     Defendant John A. Pileski ("Pileski") is a citizen of the state of New York and has been a Director of New York Community Bancorp, Inc. and New York Community Bank since January 2003 and serves on the Audit and Nominating Committees of the Board. A certified public accountant, Defendant Pileski retired as a partner in the Financial Services Practice of KPMG LLP in June 2000, following a 35-year career. He knew or was reckless in not knowing of the adverse information about NYB's business and practices. He is not disinterested, is not independent, and cannot fairly and appropriately respond to any shareholder demand.

22.     Defendant Spiros J. Voutsinas ("Voutsinas") is a citizen of the state of New York and joined the Board of Directors of New York Community Bancorp, Inc. and New York Community

Bank on October 31, 2003, in connection with the Company's merger with Roslyn Bancorp, Inc. Prior to joining the Roslyn Bancorp Board in 1999, Defendant Voutsinas had been a Director of Roosevelt Savings Bank for seven years and a director of TR Financial Corp for six. In 1988, Defendant Voutsinas retired as an Executive Vice President and Director of Apple Bank for Savings with over 28 years experience in the banking industry. He is currently President of Omega Capital, Inc., a real estate development and syndication firm and a general partner of Omega Partners LP, a money management firm specializing in bank stocks. He knew or was reckless in not knowing of the adverse information about NYB's business and practices. He is not disinterested, is not independent, and cannot fairly and appropriately respond to any shareholder demand.

23.     Defendant James J. O'Donovan ("O'Donovan") is a citizen of the state of New York and has been Senior Executive Vice President and Chief Lending Officer of New York Community Bancorp and its primary subsidiary, New York Community Bank, since October 31, 2003 and a Director of the Company and the Bank since June 26, 2003. Previously, defendant O'Donovan held the titles of Executive Vice President (from 2000) and Senior Vice President (from 1987). In addition, defendant O'Donovan serves as President of the Bank's real estate subsidiaries. He knew or was reckless in not knowing of the adverse information about NYB's business and practices. He is not disinterested, is not independent, and cannot fairly and appropriately respond to any shareholder demand.

24.     Defendants in ¶¶8-23 are herein referred to as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

25.     By reason of their positions as officers, directors, and/or fiduciaries of NYB and because of their ability to control the business and corporate affairs of NYB, the Individual

-10-

Defendants owed NYB and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage NYB in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interest of NYB and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

26.     Each director and officer of the Company owes to NYB and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

27.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of NYB, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of the advisory, executive, managerial or directorial positions with NYB, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations and improper representations of NYB.

28.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of NYB, and was at all times acting within the course and scope of such agency.

-11-

29.     To discharge their duties, the officers and directors of NYB were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of NYB were required to, among other things:

a.      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b.      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d.      remain informed as to how NYB conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e.      ensure that the Company was operated in a diligent, honest and prudent manner in compliance with the applicable federal, state and local laws, rules and regulations.

-12-

30.     Each Individual Defendant, by virtue of his or her position as director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of NYB, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of the NYB Board during the Relevant Period.

31.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein, *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action law suits that allege violations of federal securities laws. As a result, NYB has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

        a.      Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

        b.      Costs incurred in investigating and defending NYB and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

-13-

32.     Moreover, these actions have irreparably damaged NYB's corporate image and goodwill. For at least the foreseeable future, NYB will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that NYB's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

33.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in the breach of their respective duties.

34.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: conceal that the Company's financial results were materially inflated as a result of, among other things, defendants manipulation of the Company's financial results in order to appear more attractive for potential merger deals. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took actions set forth herein.

35.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least June 2003 and continuing thereafter. During this time, the Individual Defendants caused the Company to conceal the true fact that NYB was misrepresenting its financial results. In addition, defendants also made other specific, false statements about NYB's financial performance and future business prospects, as alleged herein.

-14-

36.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, and waste of corporate assets; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of NYB common stock so they could protect and enhance their executive and directorial positions and simultaneously obtain larger bonuses which were directly tied to the performance of NYB.

37.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained herein.

38.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## KNOWLEDGE OF GENERAL STANDARDS OF
## INTERNAL CONTROL AND CORPORATE COMPLIANCE

39.     As sophisticated business executives with extensive banking services industry experience and expertise, the Individual Defendants were each aware of fundamental concepts of internal controls as applied to complex business organizations, as well as of the importance of adequate and effective systems to assure corporate compliance with applicable laws and regulations.

## SUBSTANTIVE ALLEGATIONS

40.     NYB serves as the holding company for New York Community Bank (the "Bank").

The Bank's principal business consists of accepting retail deposits from the general public in the

areas surrounding its branch offices and investing those deposits, together with funds generated from

operations and borrowings, into multi-family, commercial real estate, and construction loans. The

Bank also invests its cash flows into mortgage-backed and related securities and, to a lesser extent,

into various debt and equity securities.  To reduce its exposure to credit and interest rate risk, it

originates one to four family and other loans on a pass-through basis, selling such loans to a

third-party conduit upon the closing of the loans.  The Bank serves its customers through a network

of 140 banking offices in New York City, Long Island, Westchester County and New Jersey.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE RELEVANT PERIOD

41.     On June 27, 2003, the first day of the Relevant Period, NYB and Roslyn Bancorp,

Inc. ("Roslyn") announced the signing of a definitive agreement under which the two companies

would combine in a strategic merger.  The transaction, which was valued at approximately $1.579

billion, was expected to close in the fourth quarter of 2003, pending shareholder and regulatory

approval, and to be immediately accretive to diluted earnings per share.  Under the terms of the

agreement, which had been unanimously approved by the Boards of Directors of both companies,

Roslyn would merge with and into NYB and The Roslyn Savings Bank would operate as a division

of New York Community Bank.  Shareholders of Roslyn would receive 0.75 of a share of NYB

common stock in exchange for each share of Roslyn stock held at the merger date.  The transaction,

which was tax-free to Roslyn's shareholders, valued each share of Roslyn at $20.33, based on

NYB's closing price of $27.10 on June 26, 2003.  Upon the signing of the agreement, the Board of

-16-

Directors of NYB also increased its existing share repurchase authorization to enable the Company to repurchase up to 5 million shares of its common stock over the next twelve months. Under the agreement and plan of merger, Defendant Ficalora would continue to serve as President and Chief Executive Officer of the combined company.

42.    Commenting on the merger, Defendant Ficalora stated:

We are very excited about the prospects for this combined company to grow earnings and market share. The merger joins two friendly competitors to create a powerhouse multi-family lender and a premier accumulator of deposits within the attractive metro New York marketplace. It also joins two highly efficient companies whose managements have a successful record of post-merger integrations; between us, we've completed seven merger transactions, each one exceeding expectations with regard to earnings accretion and cost savings achieved.

Like our acquisition of Haven, announced three years ago today, and our merger with Richmond County, announced nine months later, the Roslyn deal will be immediately accretive to earnings and provide us with a platform for significant capital growth[.] . . . Furthermore, it provides an opportunity to significantly enhance shareholder value, which is, consistently, the driving force behind every action we take.

Building on the success we achieved in connection with our two prior merger transactions[,] . . . we will once again implement a strategic balance sheet restructuring plan. The first step will be a reduction in securities of about $3.5 billion, with the resultant cash flows used to reduce wholesale borrowings. Notwithstanding the downsizing, we expect our 2004 diluted GAAP earnings per share to reflect approximately 10.0% accretion, including anticipated pre-tax cost savings of $30.8 million within the first year. The result will be a more flexible company with higher quality assets and far less exposure to extension and interest rate risk. In addition, the restructuring will position us well to grow earnings through the production of high-quality loans funded by the cash flows from lower-yielding securities[.]

43.    On July 16, 2003, NYB reported second quarter 2003 net income of $71.8 million, up 23.4% from $58.1 million in the second quarter of 2002. The 2003 amount provided a 21.45% return on average stockholders' equity ("ROE") and a 2.36% return on average assets ("ROA"), and was equivalent to a 23.3% increase in diluted earnings per share to $0.53 from $0.43. For the six

months ended June 30, 2003, the Company reported net income of $139.1 million, representing a 33.2% increase from $104.5 million for the first six months of 2002. The 2003 amount generated an ROE of 20.83% and an ROA of 2.30%, and was equivalent to a 30.7% rise in diluted earnings per share to $1.01 from $0.77. The Company also reported cash earnings of $84.6 million, or $0.62 per diluted share, for the current second quarter and $156.9 million, or $1.14 per diluted share, for the current six-month period. The Company's cash earnings thus added $12.9 million, or 17.9%, more to Tier 1 regulatory capital than its GAAP earnings for the current second quarter and $17.8 million, or 12.8%, more than its GAAP earnings for the first six months of 2003. The significant difference between the Company's cash and GAAP earnings in the second quarter of 2003 partly reflects the substantial appreciation in the value of shares held in the Company's stock-related benefit plan, which is charged against earnings for purposes of GAAP accounting but added back when calculating the Company's cash earnings for the same period. In the three months ended June 30, 2003, the value of the Company's shares rose 30.2%, which resulted in higher stock-based compensation and benefits expense for the quarter, while also having a dilutive effect under the Treasury method of accounting for stock options on the Company's earnings per share.

44. Commenting on the Company's second quarter 2003 performance, Defendant Ficalora stated:

> Our second quarter performance underscores four of the strengths of this institution; our capacity to originate multi-family mortgage loans; the consistent quality of our assets during a time of economic uncertainty; the significant efficiency of our operations at a time when we are enhancing our franchise; and the success of our leveraged growth strategy.

> . . . Our second quarter mortgage originations exceeded $767 million, and with a current pipeline of $723.3 million, it is evident that our lending capacity continues to be very strong. The quality of our assets reflects the ongoing strength of our credit standards: This was our 35th consecutive quarter without any net charge-offs, and

our second consecutive quarter featuring a reduction in non-performing assets and loans.   At quarter's end, non-performing assets were a mere $13.4 million, representing 0.11 % of total assets, including non-performing loans of $13.3 million, representing 0.23% of loans, net.

Despite the growth of our balance sheet and extensive enhancements to our branch network, we realized further improvements in our efficiency ratio[.] . . . In the second quarter of 2003, our efficiency ratio was 23.89%, representing a 311-basis point improvement, reflecting our ability to hold the line on expenses and to increase revenues. Total revenues rose 15% year-over-year, despite the pressure placed on our margin by the accelerated rate of prepayments, the replenishment of our asset mix with lower-yielding loans and investments, and our decision to allocate $70.5 million toward the repurchase of Company shares over the past three months.

The second quarter was further highlighted by three events that illustrate the strength of our performance, as well as our commitment to providing our shareholders with a meaningful return[.] . . .   The first of these was the issuance of a 33-1/3% stock dividend in connection with a 4-for-3 stock split on May 21st. At the same time as we announced the split, we also announced a 12% increase in our quarterly cash dividend payment. As a result, the dividend has increased 40% since the start of the year.

The third event – and the one that we believe represents the greatest potential return to our investors – was the signing of a definitive merger agreement, on June 27th, with Roslyn Bancorp, Inc.  The $1.6 billion transaction is currently executed to be 10% accretive to 2004 earnings and to result in our becoming the New York metro region's largest community bank, with a current pro forma market cap of $6.4 billion, based on yesterday's close[.] . . .

In connection with the signing of the merger agreement with Roslyn, . . . we also announced that our Board had increased our current share repurchase authorization, enabling us to repurchase up to five million additional shares of Company stock. In addition, both institutions have the ability, under the terms of the agreement, to purchase their own and each other's shares.

The fundamental strengths revealed by our second quarter performance augur well for the proposed merger, which we look forward to completing in the fourth quarter of 2003[.] . . .   We are currently in the process of preparing the necessary applications and filings, which is the first step toward receiving the regulatory and shareholder approvals we need for the merger to take place.

Based on our second quarter results – and excluding any impact of the pending Roslyn merger – we are currently projecting 2003 diluted GAAP earnings per share of $2.04 to $2.10. Our current projection for 2004 is $2.53 – reflecting the proposed

merger with Roslyn Bancorp, the projected repurchase of five million shares over the next four quarters, and the projected downsizing of the pro forma balance sheet by $3.5 billion[.]

45.    Also on July 16, 2003, Ficalora was interview by *Bloomberg's* Monica Bertran. In

the course of the interview, Defendant Ficalora stated, in pertinent part:

[O]ur particular niche is rent-controlled, rent-stabilized buildings, and we continually [inaudible] whether rates are going up or going down, because the property owners are refinancing the expanding cash flow. So as a result of that, even in the worst of times, '88 through '92, when people were losing large amounts of money on loans, we lost zero. In fact, for decades, we've had no charges against our multi-family loan niche, because our loans are extraordinarily conservatively written on expanding cash flows. . . .

[W]e should not be affected [by interest rate changes and refinancings] in the same way as one-to-four family lenders are affected. [Multi-family loan holders] are cash flow property owners who build the cash flow over time, so they're long term holders of the property, building the cash flow and refinancing the cash flow. So although they're affected by rates, that is not the only factor.

46.    On August 14, 2003, NYB filed its quarterly report with the SEC on Form 10-Q. The

Company's Form 10-Q was signed by Defendant Ficalora and reaffirmed the Company's previously

announced financial results.   Additionally, the Company represented the following:

The statements reflect all normal recurring adjustments that, in the opinion of management, are necessary to present a fair statement of the results for the periods presented.   Certain reclassifications have been made to prior-year financial statements to conform to the 2003 presentation.   There are no other adjustments reflected in the accompanying consolidated financial statements.   The results of operations for the three and six months ended June 30, 2003 are not necessarily indicative of the results of operations that may be expected for all of 2003.

47.    On August 29, 2003, on *Bloomberg's* Brian Sullivan, host of *Chartbusters*,

interviewed Defendant Ficalora about the impact refinancing and interest rate increases could have

on NYB's business and its newly augmented portfolio of loans.   Ficalora stated:

We are very different from most other banks. We are continually refinancing multi-family loans, which are not impacted directly by the change in interest rates.

-20-

> They're not part of the refi boom. . . . And because we're dealing with cash flow property owners, they refi their cash flow as their cash flow grows, so they're not necessarily tied directly to interest rates. . . . [A]ll of our metrics are better than the sector as a whole. We have the best metrics for the last seven years. We're ranked No. 1 in the country of all the large banks. Our margin is over 4 percent. The second quarter was the worst likely margin for us. This change in interest rates moves assets but does not move our liabilities, so therefore our margins will be improved as a result of this. . . . This will improve the earnings that were projected in all of the models that we put forth. And, obviously, since there's so much in the way of assets that have been priced up, better than $4 billion between our portfolio and theirs – on a relatively small portfolio that's a fairly sizable amount – that greatly improves our margins and our earnings as a result.

48.    On October 22, 2003, NYB reported third quarter 2003 net income of $72.2 million, up 19.6% from $60.4 million in the third quarter of 2002. The 2003 amount provided a 22.05% return on average stockholders' equity ("ROE") and a 2.28% return on average assets ("ROA"), and was equivalent to a 20.5% rise in diluted earnings per share to $0.53 from $0.44. The Company's third quarter 2003 diluted earnings per share would have amounted to $0.55 had the Federal Home Loan Bank of New York ("FHLB-NY") not suspended its third quarter dividend. The suspension reduced the Company's net income by $2.2 million after taxes, equivalent to $0.02 per diluted share. In addition, the Company's third quarter 2003 diluted earnings per share reflected the $0.01 per share impact of a 1.5 million-share increase in common stock equivalents. For the nine months ended September 30, 2003, the Company reported net income of $211.3 million, representing a 28.2% increase from $164.8 million in the year-earlier nine months. The 2003 amount provided an ROE and ROA of 21.24% and 2.29%, respectively, and was equivalent to a 27.3% rise in diluted earnings per share to $1.54 from $1.21. The Company also reported cash earnings of $80.3 million, or $0.58 per diluted share, for the current third quarter and $237.2 million, or $1.73 per diluted share, for the current nine-month period. The Company's cash earnings thus added $6.6 million, or 9.2%, more to Tier 1 regulatory capital at September 30, 2003 than its third quarter GAAP

-21-

earnings and \$21.4 million, or 10.2%, more than its GAAP earnings for the nine months ended at

that date.

49.  Commenting on the Company's third quarter 2003 performance, Defendant Ficalora

stated:

> At \$0.53, our diluted earnings per share were a solid 20% above the year-earlier
> level, despite the two-penny impact of the FHLB-NY's suspension of their third
> quarter dividend. The impact of the suspension shows up most in our net interest
> margin, which equaled a very respectable 4.04% for the quarter, but would have been
> 12 basis points higher had the FHLB-NY dividend been received.

> Notwithstanding the possibility of the FHLB-NY suspending its dividend for the
> remainder of the year, we are upping our full-year stand-alone 2003 estimates to a
> range of \$2.06 to \$2.11 per diluted share[.] . . . This range conveys our confidence
> in our prospective performance, and excludes the impact of our currently pending
> transactions: the sale of our South Jersey Bank Division to Sun National Bank and
> our proposed merger with Roslyn Bancorp.

> Subject to shareholder approval at our respective shareholder meetings on the 29th
> of October, the Roslyn merger is expected to close on October 31st [.] . . . Our
> current balance sheet reflects the steps we've been taking, in anticipation of the
> merger, to prepare for the restructuring of the combined balance sheet. Several of
> the quarter-end balances on our current statement of condition will look substantially
> different when we issue our full-year results in January 2004. For example, our
> balance of borrowings has grown considerably, as we've capitalized on the yield
> curve; post-merger, we can expect the ratio of borrowings to total assets to be
> reduced. Our securities portfolio has been similarly readied for combination, as we
> invested in securities with low extension risk characteristics.

> Our pipeline, which now stands at \$1.5 billion – setting a new Company record –
> will be even larger once our two banks combine[.] . . . The same can be said of our
> total assets, which will exceed \$21 billion, and our market cap, which should far
> exceed the \$6 billion mark.

> Our agreement to sell our South Jersey Bank Division to New Jersey-based Sun
> National Bank was another third-quarter highlight. Currently scheduled to close in
> December, the transaction is expected to generate an after-tax contribution to capital
> of approximately \$26 million[.] . . .

> The merger with Roslyn will bring us to a higher level, . . . much like our
> transactions with Richmond County and Haven Bancorp did before. With more

-22-

assets, an expanded franchise, and greater earnings potential, we believe we are better positioned today to create shareholder value than at any prior time in our ten-year history.

50.     In an interview with *Bloomberg's* Melissa Lee on October 22, 2003, Defendant

Ficalora further explained NYB's business model and the likely effects of interest rate changes:

FICALORA: [S]ince we are primarily a multi-family lender that refinances continually, interest rates do not dominate the activity that we have, so the move in interest rates have been, particularly good, with regard to the transaction, which is about to close in the acquisition of Roslyn Bancorp. So, in that case, the interest rates are going to cause us to have significantly better earnings than were contemplated when we announced the deal in June.

LEE: So, you're actually going to be doing better in a rising interest environment?

FICALORA: That's right. In actuality, all of the models we laid out were at a much lower rate. So with the rising interest rate environment, since they're the securities portfolio was structured to re-price, no matter whether rates were going up or not, it automatically will give us significantly more assets, at better yields, than were contemplated in the deal.

* * *

FICALORA: [O]f all the banks out there, we, probably, have the best potential to increase our earnings over the future periods. A fully valued stock would be a stock that actually, in caparison to others in the group, is in fact trading at a price that is indicative of its future earnings. In our case, we are trading at a high multiple on trailing earnings because we are continually growing, much more rapidly that our peers, both our earnings and our size. We'll be almost twice our size by the end of the year. As a result, we will have significant increases in our earnings, and that will compare very favorably to all the rest of the group. . . .

LEE: I did want to talk about the move in the interest rates because you had indicated that, as they move higher that's good for your business, but as for the impact on your bond portfolio, because you've got on of the largest portfolios as a percent of interest earning assets compared to you peers. So how does that impact the value of that bond portfolio.

FICALORA: Right. The value of the portfolio would be adversely affected, if it was that so much of the portfolio wasn't re-pricing. We have a very significant proportion of that portfolio that is re-pricing since June 30th. So as a result, most of that portfolio will be at market by December 31st.

\* \* \*

FICALORA: As we sit today, our assets are probably the most risk averse assets that are out there in the marketplace.

51.     On November 14, 2003, NYB filed its quarterly report with the SEC on Form 10-Q.

The Company's Form 10-Q was signed by the Individual Defendants and reaffirmed the Company's

previously announced financial results. Additionally, the Company represented the following:

> The statements reflect all normal recurring adjustments that, in the opinion of management, are necessary to present a fair statement of the results for the periods presented. Certain reclassifications have been made to prior-year financial statements to conform to the 2003 presentation. There are no other adjustments reflected in the accompanying consolidated financial statements. The results of operations for the three and nine months ended September 30, 2003 are not necessarily indicative of the results of operations that may be expected for all of 2003.

52.     On November 3, 2003, NYB announced the following:

> New York Community Bancorp, Inc. (NYSE: NYB) today announced that its strategic merger with Roslyn Bancorp, Inc. ("Roslyn") was completed following the close of business on October 31, 2003. In accordance with the Agreement and Plan of Merger announced on June 27, 2003, Roslyn merged with and into New York Community - Bancorp and Roslyn's primary subsidiary, The Roslyn Savings Bank, merged with and into New York Community Bank (the "Bank").

> Based upon a fixed exchange ratio of 0.75 of a share of New York Community Bancorp stock for each share of Roslyn stock outstanding, approximately 57 million shares of stock were issued in the transaction, bringing the number of New York Community Bancorp shares outstanding to approximately 195 million. Reflecting Friday's closing price of $36.20, the combined company has a market capitalization of approximately $7 billion, making it the third largest thrift in the nation and the second largest publicly traded company headquartered on Long Island, based on market cap.

53.     On January 15, 2004, NYB announced that its Board of Directors had declared a

four-for-three stock split in the form of a 33-1/3% stock dividend, to be paid on February 17, 2004

to shareholders of record at the close of business on February 2, 2004. Shareholders would receive

one additional share of NYB stock for every three shares held, and cash in lieu of fractional shares

based on the average of the high and low trading price on the record date, as adjusted for the split.

Commenting on the stock split, Defendant Ficalora stated:

> Once again, the Company's commitment to enhancing share value has been vividly conveyed by the actions of our Board. With our stock price having reached a 52-week high of $40.22, we declared what is now our ninth stock split in ten years as a stock-form institution, and the second split we've declared in the last nine months alone. The value of our shares has grown 54% since May 21st, when our last stock split was completed and 48% since we announced our merger with Roslyn Bancorp, Inc. on the 27th of June. In the past twelve months, our shareholders have received a 92% total return on their investment, assuming the reinvestment of their quarterly cash dividends. Going back to our IPO, the total return on investment amounts to a rather significant 4,016%.

> In the coming year, we look forward to building on our record of enhancing shareholder value and to recording a meaningful level of asset and earnings growth[.] . . . We look forward to updating our 2004 diluted EPS projections when we issue our full-year 2003 earnings release later on this month.

54.   On January 26, 2004, NYB reported earnings for the first time since completing its merger with Roslyn on October 31, 2003. Reflecting two months of combined operations, the Company reported fourth quarter 2003 net income of $112.1 million, signifying a 74.0% increase from $64.4 million in the fourth quarter of 2002. The 2003 amount was equivalent to $0.64 on a diluted per share basis, reflecting a 39.1% increase from $0.46 in the year-earlier three months. For the twelve months ended December 31, 2003, the Company reported net income of $323.4 million, signifying a 41.1% increase from $229.2 million in 2002. The 2003 amount was equivalent to $2.20 on a diluted per share basis, reflecting a 31.7% year-over-year increase from $1.67. In addition to the benefits of the Roslyn merger, the Company's three-and twelve-month 2003 earnings reflect a pre-tax net gain of $37.6 million stemming from the sale of the branches comprising its South Jersey Bank Division on December 19, 2003. Equivalent to $22.7 million, or $0.13 per diluted share, on an after-tax basis, the net gain offset an after-tax merger-related charge of $19.0 million, or $0.11

per diluted share. The Company also reported 2003 cash earnings of $379.2 million, including
$141.9 million in the fourth quarter of the year. The full-year amount was equivalent to $2.58 on
a diluted per-share basis, up 36.5% from $1.89 in the year-earlier twelve months. The fourth quarter
amount was equivalent to $0.81 on a diluted per-share basis, up 62.0% year-over-year from $0.50.
The Company's 2003 cash earnings thus contributed $55.8 million, or 17.3%, more to tangible
capital than its comparable GAAP earnings; its fourth quarter 2003 cash earnings contributed $29.9
million, or 26.6%, more to tangible capital than its comparable GAAP earnings alone.

55.    Commenting on the Company's performance, Defendant Ficalora stated:

Our fourth quarter and full-year performance accomplished two important objectives.
First, they underscored the merits of our merger with Roslyn Bancorp; second, they
underscored our capacity as a multi-family lender and the magnitude of our
multi-family market niche.   The first of these was clearly conveyed by the
year-over-year growth in our earnings, and the second by the record volume of
multi-family mortgage loans produced.

At $0.64, our diluted earnings per share not only exceeded the Street's expectations,
but also our original projections for the fourth quarter of the year. While $0.02 can
be attributed to the sale of our South Jersey Bank Division in December less certain
merger-related charges, the $0.62 remaining was five cents ahead of the First Call
consensus and represents a year-over-year increase of 35%[.]

During the quarter, we deployed most of the cash flows derived from securities sales
and repayments into the production of multi-family mortgage loans[.] .   .   .
Originations totaled $1.6 billion in the quarter, boosting our year-to-date production
past $3.3 billion. That's $1.3 billion, or 64%, above our 2002 volume, and--perhaps
even more telling--equal to the total volume of multi-family loans produced from
2000 through 2002. At year-end, multi-family loans totaled $7.4 billion; excluding
$1.4 billion of such loans acquired in the merger, the year-over-year portfolio growth
was well in excess of the 20% growth originally projected, amounting to
approximately 33%. Total loans rose 91% year-over-year to $10.5 billion; excluding
$3.6 billion of loans acquired in the merger, the year-over-year portfolio growth was
approximately 26%.  With a current pipeline in excess of $1.4 billion, it would
appear that 2004 is off to a solid start, as well. . . . While the production of
multi-family mortgage loans has been our primary post-merger focus, the
repositioning of our securities portfolio has also been an important focal point.

-26-

Securities totaled $9.5 billion at the end of December, representing a $2.3 billion reduction since the Roslyn merger was announced.

Another achievement that augurs well for our 2004 performance was the level of net interest income we recorded in the fourth quarter of 2003[.] . . . At $173 million, our net interest income was up 50% on a linked-quarter basis and up 80% year-over-year. Reflecting the record volume of loans produced, as well as the Roslyn merger, our average balance of interest-earning assets nearly doubled to $18 billion, reflecting only two months of combined results. In 2004, we would expect to see continued growth in our net interest income, as we continue to deploy more of our cash flows into higher-yielding multi-family loans.

We also were extremely pleased by our fourth quarter spread and margin[.] . . . While we had expected the merger to produce a substantial level of compression, the actual measures we recorded were higher than the pro forma measures we had projected when the merger was announced. Reflecting the change in market interest rates and the profitable deployment of our cash flows into higher yielding assets, our fourth quarter spread and margin amounted to 3.80% and 3.84%. Based on the current rate environment, we would expect to sustain these measures throughout the quarters ahead.

While line-item growth was a significant component of our post-merger performance[.] . . . consistency also proved to be an important theme. Despite the dramatic growth in the balance of mortgage loans outstanding, the ratio of non-performing assets to total assets at the end of December was unchanged from the year-earlier measure, 0.15%. We also maintained our efficiency, despite the net expansion of our franchise from 110 to 139 branches. Excluding the merger-related charge and the substantial net gain on the sale of our South Jersey Bank Division, our efficiency ratio improved significantly, to 21.95%. Having successfully completed the integration of our information systems early in January, we expect to realize meaningful cost savings throughout the year.

10-Year Compound Annual Growth Rates
Not to be overlooked in our discussion of 2003 earnings is the significant level of earnings and asset growth we've achieved in our ten years as a stock-form bank[.] . . . In the ten years ended December 31, 2003, our earnings grew at a compound annual growth rate of 38.9%; on a diluted per share basis, the CAGR is an impressive 30.0%. Our assets rose at a CAGR of 35.9% over the past 40 quarters, boosted by merger transactions and the production of multi-family loans. At $7.4 billion, our year-end portfolio of such loans reflects a ten-year CAGR of 32.9%.

During this time, our shareholders have received a significant return on their investment[.] . . . From the time of our IPO through January 23, 2004, when our stock traded at a 52-week high of $41.10, the total return to our charter investors was

-27-

4,106%. From the time the Roslyn merger was announced through that date, the total return was also impressive, amounting to 54% in little more than six months. Based on the growth in our market price and the projected growth in our earnings, we announced a 4-for-3 stock split in the form of a 33-1/3% stock dividend on the 15th of January and a 12% increase in our quarterly cash dividend on January 21st.

Increase in Projected 2004 Diluted Earnings Per Share Reflecting the strength of our fourth quarter 2003 results, and our confidence in our ability to efficiently generate revenue growth over the next four quarters while maintaining the quality of our assets, we have increased our projections for 2004 diluted earnings per share[.] . . . At the time the Roslyn merger was announced, we intended to achieve 10% earnings accretion, with 2004 diluted earnings per share of $2.53. At this time, we expect our 2004 diluted earnings per share to range from $2.85 to $2.90, suggesting potential earnings accretion of 26% from our original stand-alone projection, and a better than 34% increase above the core earnings of $2.17(5) we recorded in 2003.

Once our 4-for-3 stock split takes place on February 17th, our 2003 diluted earnings per share will adjust to $1.65 and our 2004 diluted earnings per share estimates will adjust to a range of $2.14 to $2.18, including $0.47 to $0.49 for the first quarter of the year.

56.    Also on January 26, 2004, NYB announced that it had issued and sold approximately 10 million shares of its common stock in a follow-on offering underwritten by Bear Stearns, generating proceeds of approximately $400 million, pursuant to a prospectus supplement to the prospectus filed as part of the Company's universal shelf registration on Form S-3 dated May 29, 2003. The proceeds from the offering would be used for a variety of general corporate purposes.

57.    In the Company's third announcement of January 26, 2004, NYB announced that it was raising its diluted earnings per share projections for 2004 to reflect the proposed issuance and sale of approximately 10 million shares of its common stock in a follow-on offering underwritten by Bear Stearns. The offering, which was expected to generate proceeds of approximately $400 million for general corporate purposes, was expected to be immediately accretive to the Company's diluted earnings per share and 40% accretive to its tangible book value per share. As a result of the offering, the Company raised its diluted earnings per share estimate for 2004 to a range of $2.90 to

-28-

$2.94. At the high end of the range, the Company's 2004 diluted earnings per share were expected to be approximately 34% higher than its 2003 diluted earnings per share of $2.20. Effective February 17, 2004, when the Company would issue a 33-1/3% stock dividend pursuant to a 4-for-3 stock split, the 2004 estimate would adjust to a range of $2.17 to $2.20.

58.   On January 30, 2004, the Company announced that it had completed its follow-on offering of 10,125,000 shares of common stock. The offering, which was underwritten by Bear Stearns, generated net proceeds of approximately $400 million and was approximately 40% accretive to the Company's year-end 2003 tangible stockholders' equity and tangible book value per share. Reflecting the additional capital, the Company's tangible stockholders' equity at December 31, 2003 increased from $851 million to $1,251 million; its tangible book value per share increased from $4.53 to $6.32 at the same date.

59.   On March 15, 2004, the Company filed its annual report with the SEC on Form 10-K. The Company's Form 10-K was signed by the Individual Defendants and reaffirmed the Company's previously announced financial results. Additionally, the Company's Form 10-K included the following representation from its auditors, KPMG, LLP, incorporated by reference from the Company's 2003 Annual Report to Shareholders and attached as an exhibit to the Form 10-K:

> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of New York Community Bancorp, Inc. and subsidiaries as of December 31, 2003 and 2002, and the results of their operations and cash flows for each of the years in the three-year period ended December 31, 2003, in conformity with accounting principles generally accepted in the United States of America.

60.   On April 21, 2004, NYB reported first quarter 2004 earnings of $130.0 million, up 93.0% from $67.4 million in the first quarter of 2003. While the 2004 GAAP amount was in excess of the Company's expectations, its cash earnings exceeded its expectations even more significantly.

-29-

The Company reported an $88.3 million, or 122.1%, rise in first quarter 2004 cash earnings to $160.6 million; its cash earnings thus contributed $30.5 million, or 23.5%, more to tangible capital than its comparable GAAP earnings alone. On a basic per-share basis, the Company's GAAP and cash earnings rose 35.1% and 55.0%, respectively, to $0.50 and $0.62. While earnings growth, capital growth, and loan growth were all stronger in the quarter, the Company also recorded an increase in common stock equivalents and an increase in shares issued in connection with its stock-related benefit plans. As a result, the Company's diluted earnings per share reflected a higher share count than its basic earnings, but still resulted, as it had expected, in GAAP and cash earnings of $0.48 and $0.59 per diluted share. While the Street's consensus share count was substantially below the 273.3 million actually factored into the first quarter diluted per-share calculation, the Company reiterated its diluted GAAP earnings per share projections of $2.17 to $2.20 for the full year.

61.     Commenting on the Company's first quarter 2004 earnings, Defendant Ficalora stated:

> We are very pleased with our first quarter 2004 performance, which speaks well for our prospects in 2004. Having increased our tangible equity nearly 60%, our net income exceeded our expectations, and was up 16% linked-quarter and 93% year-over-year. In addition, our multi-family loan portfolio grew at an annualized rate that exceeded our original projection of 20%. The increase reflects the record volume of loans produced in our first full quarter as a combined institution with Roslyn Bancorp; loan originations totaled $1.1 billion, exceeding last year's record first quarter volume by $300 million, representing an increase of 39%. I'm also pleased to report that there are $1.7 billion of loans in our current pipeline, with multi-family loans accounting for 80% of that amount.
>
> Linked-quarter Expansion of Spread and Margin
> Another highlight of our first quarter performance was the substantial linked-quarter increase in our spread and margin to 3.93% and 4.00%. Clearly, these measures rank among the best in the nation, and will provide a significant cushion in the event that market interest rates do, in fact, rise in the months ahead. The linked-quarter

expansion reflects the full-quarter benefit of our post-merger balance sheet restructuring, which is in its initial stages, and the production of $3.0 billion of loans over the last six months[.] . . .

Efficiency Ratio Improves to 18.70%

Yet another contributing factor to our first quarter performance was the improvement in our efficiency ratio to 18.70%[.] . . . On a stand-alone basis, New York Community and Roslyn were among the most efficient thrifts in the nation; it stands to reason that the combination would create an even more cost-effective entity. The successful integration of our computer systems was another gratifying achievement, along with the post-merger rebranding of our branches in Brooklyn, Queens, and Long Island, which reaffirmed the strength of our focus on community identity.

2004 Diluted EPS Estimates Range from $2.17 to $2.20

Based on the strength of our first quarter 2004 results and our current pipeline, we are maintaining our full-year earnings guidance in the range of $2.17 to $2.20 per diluted share[.] . . . At the low end of the range, we're suggesting a 33% year-over-year increase; at the high end, we're projecting an increase of 35%. Furthermore, the current range suggests that the Roslyn merger will be 25% to 27% accretive to earnings, a significant increase from our original projection of 10%.

Board Raises Dividend; Authorizes Another Five Million-Share Repurchase

Based on the strength of our performance to date, and our full-year prospects, we raised our quarterly cash dividend for the sixth consecutive quarter at last night's meeting of the Board[.] . . . The current increase boosts our dividend to $0.25 per share, signifying a linked-quarter increase of 19%. This amount represents a 3.5% yield, based on our closing price last evening, and a 122% increase in the quarterly cash dividend since the fourth quarter of 2002. The dividend will be paid on May 17, 2004 to shareholders of record as of the close of business on May 3, 2004.

We are today, as we always have been, a solid financial institution, with an unparalleled record of earnings growth, a dominant niche in our market, and stellar records of asset quality and efficiency. Accordingly, we have always believed that our shares represent a sound investment. Since 1994, the Company has repurchased approximately 91 million shares at an approximate cost of $902 million; we are very much prepared to continue in this vein[.] . . . Last night, the Board authorized an additional five million-share repurchase, to begin upon completion of the share repurchase authorization that is currently in effect.

As in the past, these actions reflect our focus on shareholder value and the significant fundamental strength of New York Community Bancorp [.] . . .

## THE BOARD AUTHORIZES ENGAGEMENT OF INVESTMENT BANKERS

62.     On Sunday, May 9, 2004, NYB announced that its Board of Directors had authorized the Company's management team to engage Bear Stearns & Co., Inc., Citigroup Global Markets, Inc., and Sandler O'Neill & Partners, L.P. to assist the Company in undertaking a review of its strategic alternatives, including remaining independent.   Commenting on the announcement, Defendant Ficalora stated: "We have always been a company that has focused on shareholder value, and this review is consistent with that focus."

63.     News of the engagement of Bear Stearns & Co., Inc., Citigroup Global Markets, Inc., and Sandler O'Neill & Partners, L.P. shocked the market. For months, and in numerous interviews, filings, and press releases, Defendant Ficalora maintained that, given the nature of the Company's business, assets, and liabilities, NYB would not only do better than its rivals in its sector, but would even thrive in an environment of rising interest rates. Furthermore, Ficalora stated that NYB's predictions were based on lower interest rates, and that an interest rate increase would be good for the company.   However, the sudden engagement of three financial firms to "review strategic alternatives" was the market's and investors' first indication that NYB's strategy was not working as planned or advertised.

64.     The day after NYB's announcement, on Monday, May 10, 2004, the price of NYB's shares dropped over $2.53 from its close the previous trading day, May 7, 2004, of $24.13, or 10.5 %, to as low as $21.60 per share. At the close of trading, NYB shares had fallen $1.33 per share, or 5.5%, to close at $22.80 per share on volume of 9 million shares – nearly three times its usual volume.

-32-

65.    On May 10, 2004, NYB filed its quarterly report with the SEC on Form 10-Q. The

Company's Form 10-Q was signed by the Individual Defendants and reaffirmed the Company's

previously announced financial results. Additionally, the Company represented the following:

> The statements reflect all normal recurring adjustments that, in the opinion of
> management, are necessary to present a fair statement of the results for the periods
> presented.    Certain reclassifications have been made to prior-year financial
> statements to conform to the 2004 presentation. There are no other adjustments
> reflected in the accompanying consolidated financial statements. The results of
> operations for the three months ended March 31, 2004 are not necessarily indicative
> of the results of operations that may be expected for all of 2004.

66.    On July 1, 2004, after the close of trading, NYB continued to slowly release

information about its financial condition to the market:

> Pursuant to the review of strategic alternatives it announced on May 9th, New York
> Community Bancorp, Inc. (NYSE: NYB) today announced that it has deleveraged
> its balance sheet and extended its liabilities to improve its interest rate risk profile.
>
> In connection with this strategy, the Company sold $5.0 billion of available-for-sale
> securities with an average yield of 4.62% and an expected weighted average life of
> six years in the current rate environment. The sale resulted in a one-time after-tax
> charge of approximately $95 million, or $0.35 per diluted share, which will result in
> the Company recording second quarter 2004 diluted GAAP earnings per share in the
> range of $0.15 to $0.16.
>
> The proceeds from the sale of securities were utilized to reduce the Company's
> short-term borrowings by $5.0 billion. As a result of the deleveraging, collateralized
> wholesale borrowings were reduced to $9.9 billion at June 30, 2004, representing
> approximately 41% of total assets at that date. In addition, the Company extended
> $2.4 billion of short-term borrowings to a three-year average maturity, with an
> average cost of 3.32%.
>
> The Company's total investment securities portfolio was reduced to approximately
> $8.5 billion at June 30, 2004, representing approximately 35% of total assets.
> Included in the quarter-end total were approximately $1 billion of investment
> securities that were transferred from "available for sale" to "held to maturity" and
> that had a net unrealized depreciation, net of tax, of approximately $29 million at the
> time the transfer took place. Securities available for sale totaled $3.9 billion at June
> 30, 2004, including $3.6 billion of mortgage-backed and -related securities with an
> expected weighted average life of approximately four years. The net unrealized

depreciation, net of tax, on the total available-for-sale portfolio was approximately $84 million at quarter-end. It is management's expectation that this portfolio will be further reduced through principal repayments over time.

Commenting on the Company's actions, President and Chief Executive Officer Joseph R. Ficalora stated, "The deleveraging of the balance sheet and the extension of liabilities improved the Company's interest rate risk profile, neutralizing our one-year interest rate sensitivity gap to approximately 0% at the second quarter's end.

"The Company is currently projecting 2004 diluted GAAP earnings per share in the range of $1.42 to $1.47," Mr. Ficalora noted. "Excluding the impact of the one-time charge in the second quarter, 2004 diluted core earnings per share would be expected to range from $1.77 to $1.82, including second quarter diluted earnings per share in the range of $0.50 to $0.51.

"Reflecting the full-year impact of the reduction in interest-earning assets during the recent quarter, the Company is currently projecting diluted earnings per share in the range of $1.65 to $1.70 for 2005," Mr. Ficalora continued. "Our 2004 and 2005 estimates assume a 200-basis point increase in short-term interest rates and a flattening yield curve over the next four quarters, as well as interest-earning asset growth of approximately 10%, primarily driven by loan production. In addition, these projections reflect our expectation that the securities still remaining will continue to provide us with cash flows to support the growth of our loan portfolio.

"Although near-term earnings will be reduced, the deleveraging of the balance sheet will enhance the Company's capital position," Mr. Ficalora added. "The Company's tangible common equity ratio was approximately 4.5% at the close of the second quarter; its Tier 1 leverage capital ratio on a consolidated basis at June 30th was approximately 7.6%."

Commenting further on the actions taken in the second quarter, Mr. Ficalora stated, "The Board of Directors and management team have been actively engaged in a detailed analysis of our balance sheet and of the options available to us. Throughout our deliberations, our foremost consideration has been the creation of long-term shareholder value, consistent with the focus we have maintained throughout our public life.

"We determined that our best course of action would be to take the specific steps that we have taken, and move forward with our business model, generating earnings through our fundamental strengths: our dominance as a multi-family lender in New York City's rent-controlled and rent-stabilized market; the quality of our assets; the industry-leading efficiency of our operations; and the profitability of our branch network, with 141 banking offices.

-34-

"By taking these actions, we are better positioned to deal with the rise in rates that, no doubt, lies before us, and to compete in a changing market on the basis of our fundamental strengths," Mr. Ficalora said. "In light of this decision, we can now focus on our merits--the strengths on which our earnings and value were initially built and will continue to grow. For example, loan originations reached approximately $2.1 billion in the second quarter, with most of the production occurring in our multi-family market niche.

"Multi-family loan originations totaled $1.5 billion in the second quarter, establishing a new record, and more than doubling our first quarter 2004 production of $706 million. As a result, our portfolio of multi-family loans grew from $7.4 billion at year-end 2003 to approximately $8.5 billion at June 30th, reflecting an annualized growth rate of approximately 32%. The average multi-family loan had a principal balance of about $2.7 million and a loan-to-value ratio of approximately 59%. On an annualized basis, total net loans rose 27% during this time to approximately $11.8 billion. We believe that we are very much on track to surpass our objective of 20% net loan growth by the end of the year," Mr. Ficalora commented.

"The growth in our niche portfolio, and the term-yield advantage provided by its structure, have distinguished our performance during prior periods of rising and falling interest rates. Of course, significant moves in interest rates typically trigger changes in credit cycles. It's fair to say that the quality of our portfolio over multiple credit cycles has demonstrated our ability to outperform our peers with regard to loan losses.

"It is also worthy of mention that we have initiated the process of growing our deposit base over the last few weeks. We are encouraged by the response of depositors to our recent efforts, and expect to see still greater results in the quarters ahead," Mr. Ficalora said.

67.     The July 1, 2004 announcement contradicted months of statements from Defendant Ficalora concerning NYB's insensitivity and amenability to interest rate changes. Indeed, by announcing that it needed to "improve its interest rate risk profile," NYB reversed its false and misleading position on its potential for growth and earnings and the effects interest changes would have on NYB.

68.     The statements contained in ¶¶41-61 were each materially false and misleading because the Defendants failed to disclose and indicate: (1) that Defendants manipulated the

-35-

Company's financial results in order to appear more attractive for potential merger deals; (2) that this was accomplished through leveraged growth funded by short-term funding; (3) the Company's projections about growth and interest rate sensitivity were lacking in any reasonable basis when made; and (4) that the Company's financial results were materially inflated at all relevant times.

## DERIVATIVE AND PRE-SUIT DEMAND ALLEGATIONS

69.    Plaintiff brings this action derivatively in the right and for the benefit of NYB to redress injuries suffered, and to be suffered, by NYB as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, and waste of corporate assets, as well as aiding and abetting thereof, by the Individual Defendants. NYB is named as nominal defendant solely in a derivative capacity.

70.    Plaintiff will adequately and fairly represent the interests of NYB in enforcing and prosecuting its rights.

71.    Plaintiff is and was an owner of NYB stock during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

72.    As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and/or Board meetings, each of the defendants knew the adverse non-public information regarding the improper accounting.

73.    The NYB Board at the time of filing of the this complaint consisted of the following sixteen individuals: defendants Manzulli, Ciampa, Doherty, Ficalora, Kupferberg, Mancino, Tsimbinos, Blake, Clancy, Farrell, Frederick, Levine, Molinari, Pileski, Voutsinas, and O'Donovan. Plaintiff made a written demand on the Board to institute this action in a letter dated January 31,

2005. (Copy attached as Ex. A). Plaintiff's counsel received a letter dated February 24, 2005 from counsel for NYB stating that the board would consider the matters raised in plaintiff's letter. NYB's board, however, has given no response to plaintiff, and more than a reasonable amount of time has elapsed since plaintiff sent her written demand on January 31, 2005. Not surprisingly, the board has done nothing to address plaintiff's written demand. The members of the board are hopelessly conflicted with intertwining financial and business relationships, many of which are obvious from publicly available information.

74.     Each of the Individual Defendants of NYB authorized and/permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

.75.     Despite the Individual Defendants' knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for NYB for any of the wrongdoing alleged by plaintiff herein.

## COUNT I

## Against All Defendants for Breach of Fiduciary Duty

76.     Plaintiff realleges and incorporates by reference each and every allegation contained above.

77.     The Individual Defendants are fiduciaries of the Company and of all of its public stockholders and owe to them the duty to conduct the business of the Company loyally, in good faith, carefully, diligently and prudently. This cause of action is asserted based upon the Individual

-37-

Defendants' acts in violation of applicable state law and common law, which acts constitute breaches of fiduciary duties.

78. The Individual Defendants breached their fiduciary duty, including the duty of care to NYB and its shareholders, by not only failing to act as an ordinarily prudent person would have acted in a like position but also by acting with gross recklessness and in conscious disregard of their responsibilities to act on the interests of NYB.

79. As a result of the Individual Defendants' wrongful conduct and actions, NYB has suffered and will continue to suffer considerable damage as a result of the numerous class actions filed against it.

80. The Individual Defendants, singly and in concert, engaged in the aforesaid conduct in the intentional breach and/or reckless disregard of their fiduciary duties to the Company and conspired to, and did abuse the control vested in them by virtue of their high-level positions in the Company.

81. By reason of the foregoing, the Individual Defendants have breached their fiduciary duties to NYB and its shareholders.

82. NYB and its stockholders have been injured by reason of the Individual Defendants' intentional and/or reckless disregard of their fiduciary duties to NYB.

## COUNT II

### Against All Defendants for Gross Mismanagement

83. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

-38-

84.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of NYB in a manner consistent with the operations of a publicly held corporation.

85.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, NYB has sustained significant damages in excess of hundred of millions of dollars.

86.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

87.     Plaintiff on behalf of NYB has no adequate remedy at law.

## COUNT III

### Against All Defendants for Waste of Corporate Assets

88.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

89.     As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, the Individual Defendants have caused NYB to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

90.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

91.     Plaintiff on behalf of NYB has no adequate remedy at law.

-39-

**WHEREFORE**, plaintiff demands relief on behalf of NYB as follows:

A.      Judgments against each of the Individual Defendants for restitution, contribution, indemnification and/or damages in favor of plaintiff, on behalf of NYB and its public stockholders, and awarding punitive and exemplary damages as appropriate, plus pre-judgment interest;

B.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, so as to assure that plaintiff and NYB have an effective remedy;

C.      An award to plaintiff of the costs and disbursements of this action, including reasonable attorneys', accountants' and experts' fees; and

D.      An award to plaintiff of such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a jury trial on all such issues which are triable before a jury.

Dated: May 6, 2005

**GAINEY & McKENNA**

By: _Thomas J. McKenna_

Thomas J. McKenna (TJM 7109)
485 Fifth Avenue, 3rd Floor
New York, NY 10017
Tel:    212-983-1300
Fax:    212-983-0383

**VIANALE & VIANALE LLP**
Kenneth J. Vianale (KV 4607)
Julie Prag Vianale (JV 4718)
Members of the Bar of this Court
2499 Glades Road, Suite 112
Boca Raton, FL 33431
Tel:    561-392-4750
Fax:    561-392-4775

**Attorneys for Plaintiff**

# Exhibit A

# GAINEY & McKENNA

ATTORNEYS AT LAW

485 FIFTH AVENUE
THIRD FLOOR
NEW YORK, NEW YORK 10017
TEL: (212) 983-1300
FAX: (212) 983-0383

e-mail: tjmckenna@gaineyandmckenna.com

666 GODWIN AVENUE
SUITE 230
MIDLAND PARK, NEW JERSEY 07432
TEL: (201) 689-9000
FAX: (201) 689-9969

Please Reply To The New York Address

January 31, 2005

### Via Certified Mail

New York Community Bancorp, Inc.
Mr. Michael F. Manzulli, Chairman of the Board
615 Merrick Avenue
Westbury, New York 11590

      Re:    New York Community Bancorp, Inc.

Dear Members of the Board:

We have been retained as counsel, together with Vianale & Vianale, LLP, by Mrs. Emily Lemond, a shareholder of New York Community Bancorp, Inc. ("New York Community Bancorp," or the "Company"). Mrs. Lemond was a shareholder when the actions contained herein occurred and continues to hold her shares. This letter represents a demand that the New York Community Bancorp board of directors take the appropriate steps to provide for equitable and therapeutic relief, as well as retroactive damages, to remedy the breach of fiduciary duty, mismanagement and corporate waste described below.

It is plain that an act of gross mismanagement has been committed by certain of New York Community Bancorp's officers and directors. The officers and directors of New York Community Bancorp failed to disclose and misrepresented the following facts to the market and its shareholders that: (i) that the Company's financial results were manipulated in order to appear more attractive for potential merger deals; (ii) that this was accomplished through leveraged growth funded by short term funding; (iii) the Company's projections about growth and interest rate sensitivity were lacking in any reasonable basis when made; and (iv) that the Company's financial results were materially inflated. As a result of these actions, the Company has now been subjected to numerous securities fraud lawsuits and will incur costs of defense, possible payments of claims in settlement or by judgment and possible payment of indemnification, as well as damage to its reputation in the community.

On May 9, 2004, New York Community Bancorp Board of Directors authorized the Company's management team to engage Bear Stearns & Co., Inc., Citigroup Global Markets, Inc., and Sandler O'Neill & Partners, L.P. to assist the Company in undertaking a review of its strategic alternatives, including remaining independent. Commenting on the announcement, Mr. Ficalora stated: "We have always been a company that has focused on shareholder value, and this review is consistent with that focus." News of the engagement shocked the market. For months, and in numerous interviews, filings, and press releases, Mr. Ficalora maintained that, given the nature of the Company's business, assets, and liabilities, New York Community Bancorp would not only do better than its rivals in its sector, but even thrive in an environment of rising interest rates. Furthermore, Mr. Ficalora stated that New York Community Bancorp's predictions were based on lower interest rates, and that an interest rate increase would be good

Mr. Michael F. Manzulli, Chairman of the Board
New York Community Bancorp, Inc.
January 31, 2005
Page 2

for the company. However, the sudden engagement of three financial firms to "review strategic alternatives" was the market's and investors' first indication that New York Community Bancorp's strategy was not be working as planned or advertised.

Following this announcement, in intra-day trading on May 10, 2004, New York Community Bancorp dropped over $2.53 per share from its previous close, on May 7, 2004, of $24.13 per share, or 10.5%, to close at a low of $21.60 per share. At the close of trading, the Company had fallen $1.33 per share, or 5.5%, to close at $21.80 per share on volume of 9 million shares -- nearly three times its usual volume.

Mrs. Lemond requests that the Board of Directors of New York Community Bancorp implement the appropriate steps to compel Joseph R. Ficalora and Michael P. Puorro, among others, to take the following action: (i) account to the Company and repay to the Company all damages sustained by the Company as a result of their wrongful conduct; (ii) require the above individuals to return to New York Community Bancorp all salaries, payments, and the value of other remuneration of whatever kind paid to them by the Company during the time they were in breach of the fiduciary duties owed to the Company; (iii) direct the above individuals to establish and maintain effective compliance programs to ensure that the Company's affiliates and employees do not engage in wrongful and illegal practices; and (iv) direct all of the above individuals to pay interest at the highest allowable statutory rate on the amount of damages sustained by the Company as a result of their culpable conduct.

The financial statements are management's responsibility. Accordingly, management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, reliably record, process, summarize, and report transactions, as well as events and conditions, consistent with management's assertions embodied in the financial statements. The Company's significant transactions and the related assets, liabilities, revenues, expenses and equity are within the direct knowledge and control of management. Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting principles ("GAAP") is an implicit and integral part of management's responsibility. This necessitates management's establishing and maintaining effective internal control over financial reporting, including the methods used within the Company, to transmit, process, maintain and access information while ensuring that the Company complies with the laws and regulations applicable to its activities. In this regard, damages include the cost of:

a.   adopting sound accounting and disclosure policies.

b.   establishing and maintaining an effective and well-functioning system of internal control.

c.   assuring that the Company's significant transactions and its communication of disclosures are within the direct knowledge and control of management.

Management's implementation and oversight of a well-conceived corporate governance system may serve to inhibit false financial reporting and the dissemination of misleading financial representations by management and others within a company. It creates the tone for a control consciousness environment and, thus, serves as the foundation for all other components

Mr. Michael F. Manzulli, Chairman of the Board
New York Community Bancorp, Inc.
January 31, 2005
Page 3

of internal control.  The control environment bears upon the dedication, integrity and ethical values of management, its commitment to competence, its participation on the Board of Directors or Audit Committee, its philosophy and operating style, its organizational structure and its assignment of authority and responsibility.  In this regard, damages include the cost of devising, preparing, documenting, communicating to employees, and implementing a blueprint which sets forth a written expression of enhanced:

a.   Integrity and ethical values (*i.e.*, as set forth in its Code of Ethical Conduct, mission statements, policy and procedure manuals and conflict of interest statements);

b.   Management commitment to competence as evidenced by management's consideration of the competence levels for particular jobs and how those levels translate into requisite skills and knowledge. Specifically, those policies and procedures which it put in place to assure that employees possess the knowledge and skills necessary to accomplish tasks that define the individual's job and that the job is being done as expected as evidence by its oversight of the hiring process and its review of anticipated performance measures (*i.e.*, management's policies and procedures as set forth in the Company's Human Resource Policy and Procedure Manuals or other written documents which, in substance, codify management's position);

c.   Organizational structure and, in particular, management's assignment of authority and responsibility (*i.e.*, management's policies and procedures regarding centralization and/or decentralization of key offices and functions as set forth in the Company's organization chart and narratives thereto); and

d.   Risk assessment as it relates to management's philosophy and operating style, and to management's approach to taking and monitoring business risks, management's attitudes and action toward financial reporting, the conservatism with which accounting estimates are developed and the frankness with which management discloses adverse occurrences (*i.e.*, management's policies and procedures at it relates to the use of outside consultants, experts and/or specialists, monitoring risks and uncertainties (including credit risk), and management's role in the establishment of accounting estimates as set forth in corporate resolutions of the Board of Directors, in management representation letters provided to the Company's independent accountants, and in Company documents evidencing management's strategies to deal with dependence on key personnel, manage growth and respond to rapid interest rate changes.

The need to participate in litigation which arose as a consequence of the accounting and disclosure improprieties which are discussed above, have caused New York Community Bancorp to spend and to continue to spend a significant sum. This sum is measurable not only in terms of legal, accounting and consulting fees and the non-productive use of Company resources, overhead, staff and management time.  It is also measurable in terms of compensation

Mr. Michael F. Manzulli, Chairman of the Board
New York Community Bancorp, Inc.
January 31, 2005
Page 4

unjustifiably paid to certain of New York Community Bancorp's officers and directors and in terms of lost and interrupted business due to the distraction of key officers and employees, a diminution of the goodwill which was previously associated with the integrity of the Company's management and the venerable name of the business, and a loss of earnings attributable to the Company's use of cash to finance the above noted litigation.

Very truly yours,

GAINEY & McKENNA

Thomas J. McKenna

cc:     Kenneth J. Vianale, Esq.

## **VERIFICATION**

STATE OF _____

COUNTY OF _____          ss.

Emily Lemond under the penalties of perjury, deposes and says she is the plaintiff

in this action; she has read the foregoing Complaint and knows the contents thereof; she was a

shareholder of the defendant company on all relevant dates as specified in the  Complaint and

that she remains a shareholder to the present time; the allegations of the Complaint are true of

her own knowledge, except as to the matters therein stated to be alleged on information and

belief and as to those matters she believes it to be true.

_____
Emily Lemond